UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|   Plaintiff, | )   <u>VERIFIED CIVIL COMPLAINT</u> |
| | )       <u>FOR FORFEITURE</u> |
| | ) |
| - v.- | ) |
| | )     25 cv 6325 |
| APPROXIMATELY $2,308,378.00 IN | ) |
| UNITED STATES CURRENCY FORMERLY | ) |
| ON DEPOSIT IN METROPOLITAN | ) |
| COMMERCIAL BANK ACCOUNT NUMBER | ) |
| XXXXXX0781, HELD IN THE NAME OF | ) |
| "BLUE FLOWER INVESTMENT FUND | ) |
| LTD"; | ) |
| | ) |
| APPROXIMATELY $1,576,887.00 IN | ) |
| UNITED STATES CURRENCY FORMERLY | ) |
| ON DEPOSIT IN METROPOLITAN | ) |
| COMMERCIAL BANK ACCOUNT NUMBER | ) |
| XXXXXX5503, HELD IN THE NAME OF | ) |
| "LOPUD INVESTMENT MANAGEMENT | ) |
| LIMITED"; | ) |
| | ) |
| APPROXIMATELY $256,356.00 IN | ) |
| UNITED STATES CURRENCY FORMERLY | ) |
| ON DEPOSIT IN METROPOLITAN | ) |
| COMMERCIAL BANK ACCOUNT NUMBER | ) |
| XXXXXX2830, HELD IN THE NAME OF | ) |
| "MUDART SPRINGS, LLC." | ) |
| | ) |
| Defendants-in-rem. | ) |

Comes now the Plaintiff, United States of America, through its undersigned attorneys, and alleges as follows:

<u>NATURE OF THE ACTION</u>

1.   This is an action in rem to forfeit approximately $4,141,621.00 in seized funds pursuant to 18 U.S.C. § 981(a)(1)(A)

on the grounds that those seized funds were involved in violations of 18 U.S.C. §§ 1960 (operation of an unlicensed money transmitting business), 1956(a)(2)(A) (international promotional money laundering), and 1956(h) (conspiracy to violate 1956).

## THE DEFENDANTS IN REM

2.    Defendants in rem constitute all funds (approximately $4,141,621.00) (hereinafter, "Defendant Properties") previously contained in the following bank accounts (hereinafter, "Subject Bank Accounts"):

A. Approximately $2,308,378.00 in U.S. currency, formerly on deposit in Metropolitan Commercial Bank (hereinafter, "MCB") account XXXXXX0781, held in the name of "BLUE FLOWER INVESTMENT FUND LTD."

B. Approximately $1,576,887.00 in U.S. currency, formerly on deposit in MCB account XXXXXX5503, held in the name of "LOPUD INVESTMENT MANAGEMENT LIMITED."

C. Approximately $256,356.00 in U.S. currency, formerly on deposit in MCB account 0199012830, held in the name of "MUDART SPRINGS, LLC."

3.    Defendant Properties were seized under the authority of seizure warrants issued by the District Court for the Southern District of New York.

4.   The Defendant Properties are presently in the custody of, and under the control of, the United States Marshals Service.

## JURISDICTION AND VENUE

5.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1355(a).

6.   Venue is proper in this District pursuant to 28 U.S.C.§ 1355(b)(1)(A) because acts and omissions giving rise to forfeiture took place in the Southern District of New York.

7.   This action in rem for forfeiture is governed by 18 U.S.C. §§ 981 and 983, the Federal Rules of Civil Procedure, and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

## RELEVANT NAMES AND ENTITIES

8.   Blue Flower Investment Fund (hereinafter, "BLUE FLOWER") is a British Virgin Islands-incorporated entity that purported to be a private investment fund that intended to invest in securities.

9.   BLUE FLOWER did not act as a private investment fund or invest in securities.

10.  From in or about September 2019 until in or about December 2020, BLUE FLOWER functioned as a money transmitting business that facilitated capital flight out of Argentina and other countries.

11.  At no time was BLUE FLOWER registered with the Financial

Crimes Enforcement Network ("FinCEN") as a money transmitting business as required by 31 CFR § 1022.380.

12. Lopud Investment Manager (hereinafter, "LOPUD") is a British Virgin Islands-incorporated entity that purported to be an investment fund manager.

13. LOPUD did not manage investments.

14. From in or about September 2020 until in or about December 2020, LOPUD operated as a money transmitting business that facilitated capital flight out of Argentina and other countries.

15. At no time was LOPUD registered with FinCEN as a money transmitting business as required by 31 CFR § 1022.380.

16. Mudart Springs, LLC (hereinafter, "MUDART SPRINGS"), is a Florida-incorporated entity that purported to be an investment holding company.

17. MUDART SPRINGS did not act as an investment holding company.

18. From in or about February 2020 until in or about December 2020, MUDART SPRINGS operated as a money transmitting business that facilitated capital flight out of Argentina and other countries.

19. At no time was MUDART SPRINGS registered with FinCEN as a money transmitting business as required by 31 CFR § 1022.380.

20. MCB is a bank and financial institution located in

Manhattan, New York.

21.   Jonathan Rivas was a partner at CONSULTANCY-1.

22.   From in or about March 2012 through at least in or about December 2020, CONSULTANCY-1 was a Buenos Aires-based financial consulting firm.

23.   CONSULTANCY-1 assisted client's in obtaining bank accounts at U.S. financial institutions.

24.   Ivo Rojnica was a client of Jonathan Rivas and CONSULTANCY-1.

25.   In September 2019, February 2020, and September 2020, MCB opened the Subject Bank Accounts for BLUE FLOWER, MUDART SPRINGS, and LOPUD, respectively.

26.   Jonathan Rivas, through CONSULTANCY-1, opened or caused to be opened the Subject Bank Accounts for BLUE FLOWER, MUDART SPRINGS, and LOPUD on behalf of Ivo Rojnica.

27.   Ivo Rojnica was an authorized signer for the Subject Bank Accounts for BLUE FLOWER, MUDART SPRINGS, and LOPUD.

28.   BLUE FLOWER, LOPUD, and MUDART SPRINGS used the Subject Bank Accounts to unlawfully operate as unlicensed money transmitting businesses.

29.   On April 15, 2025, a federal Grand Jury in the Western District of Kentucky indicted Ivo Rojnica and Jonathan Rivas with conspiracy to defraud financial institution and operate unlicensed money transmitting businesses in violation of Title 18, United

States Code, Section 371. *See* <u>United States of America v. Jonathan Rivas et al.</u>, Criminal No.: 5:25CR20-BJB (W.D. Ky.).

### GROUNDS FOR FORFEITURE
### STATUTORY BASIS

30.   Title 18, United States Code, Section 1960 prohibits operation of an unlicensed money transmitting business.

31.   Title 18, United States Code, Section 1960 defines "money transmitting" to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire . . . ."

32.   It is a violation to operate a money transmitting business without a state license, without federal registration, or while transmitting funds that are "known to the defendant to be derived from a criminal offense or are intended to be used to promote or support unlawful activity."  18 U.S.C. § 1960.

33.   Title 18, United States Code, Section 1956(a)(2)(A) prohibits transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United states with the intent to promote the carrying on of a specified unlawful activity.

34.   A "specified unlawful activity" is defined in Title 18,

6

United States Code, Section 1956(c)(7) to include, among other things, Bank Fraud in violation of Title 18, United States Code, Section 1344.

35.    Title 18, United States Code, Section 1956(h) prohibits conspiring to commit any offense under Title 18, United States Code, Section 1956.

36.    Title 18, United States Code, Section 981(a)(1)(A) provides that "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, . . . or 1960 of this title, or any property traceable to such property," is subject to forfeiture to the United States.

## OVERVIEW OF THE BLUE DOLLAR PESO EXCHANGE

37.    Due to capital flight from Argentina, the Argentine government set strict capital controls to limit the export of funds from Argentina as well as limit the exchange of Argentine Pesos into U.S. Dollars.

38.    These controls, combined with economic instability, have given rise to what are known as "blue dollar peso exchanges," which among other things, enable customers to access more U.S. dollars than are allowed under Argentine law.

39.    Because blue dollar peso exchanges are functionally money transmitting businesses, performing operations of the blue dollar peso exchange in the United States without a license is illegal under United States law.

40.   A blue dollar peso exchange enables the movement of funds between two countries without the use of international wire transfers.

41.   To operate, blue dollar peso exchangers generally require access to U.S. bank accounts that hold U.S. dollars.

42.   It is also common that blue dollar peso exchangers transfer U.S. dollars from these accounts at the direction of a client or a third party, after the client or a third party delivers Argentine pesos to the blue dollar peso exchanger in Argentina.

43.   Figure 1 illustrates the general scheme of the movement of funds from Argentina to the United States.

**Figure 1**



44.   Clients also utilized the blue dollar peso exchange to receive Argentine pesos after the client or a third-party deposits U.S. dollars into the blue dollar peso exchanger's U.S. bank

account.

45.    Figure 2 illustrates the general scheme of the movement of funds from the United States to Argentina.

**Figure 2**



## BLUE FLOWER, LOPUD, AND MUDART SPRINGS MADE MATERIAL MISREPRESENTATIONS TO ESTABLISH THE SUBJECT BANK ACCOUNTS

46.    In or around September 2019, Ivo Rojnica and Jonathan Rivas established or caused to be established BLUE FLOWER Subject Bank Account XXXXXX0781 at MCB.

47.    In or around February 2020, Ivo Rojnica and Joanathan Rivas, established or caused to be established MUDART SPRINGS Subject Bank Account XXXXXX2830 at MCB.

48.    In or around September 2020, Ivo Rojnica and Jonathan Rivas established or caused to be established LOPUD Subject Bank Account XXXXXX5503 at MCB.

49.    The Subject Bank Accounts were established under the

pretense that BLUE FLOWER, LOPUD, and MUDART SPRINGS were involved in securities and investments.

50.   The Subject Bank Accounts were pass-through accounts used to facilitate the blue dollar peso exchange.

51.   A pass-through account is a bank account that receives deposits for purposes of transferring the funds to another account.

52.   Jonathan Rivas, through CONSULTANCY-1 and on behalf of Ivo Rojnica, submitted or caused to be submitted documentation to MCB that described BLUE FLOWER's, LOPUD's, and MUDART SPRINGS' transactions involving the Subject Bank Accounts as being consistent with investment activities – specifically, BLUE FLOWER was described as a "private investment fund."

53.   All the assertions in the previous paragraph were false.

54.   Jonathan Rivas, through CONSULTANCY-1 and on behalf of Ivo Rojnica, submitted or caused to be submitted documentation to MCB that described LOPUD's transactions involving the Subject Bank Accounts as being consistent with investment activities – specifically, LOPUD as an "investment advisor[]."

55.   All the assertions in the previous paragraph were false.

56.   Jonathan Rivas, through CONSULTANCY-1 and on behalf of Ivo Rojnica, submitted or caused to be submitted documents to MCB that described MUDART SPRINGS' transactions involving the Subject Bank Accounts as being consistent with investment activities – specifically, MUDART SPRINGS as an "investment holding company."

57.  All the assertions in the previous paragraph were false.

58.  The applications submitted to MCB listed Ivo Rojnica as one of the authorized signers to the account.

59.  On December 7, 2020, federal law enforcement agents interviewed representatives from MCB (collectively, the "Bank Representatives").

60.  In substance, Bank Representatives stated that, based on representations made to MCB as well as documents submitted to MCB, MCB understood BLUE FLOWER, LOPUD, and MUDART SPRINGS to be entities involved in trading securities and investments.

61.  BLUE FLOWER, LOPUD, and MUDART SPRINGS were never represented to be money transmission businesses.

62.  An employee of Consultancy-1 emailed MCB what was purported to be supporting documentation and a private placement memorandum (hereinafter, "PPM") for BLUE FLOWER.

63.  A PPM is a legal document provided to prospective investors when selling stock or another security in a business.

64.  The BLUE FLOWER PPM listed LOPUD as BLUE FLOWER's "Investment Manager."

65.  A PPM is used in private transactions when the securities are sold pursuant to an exemption under federal or state law.

66.  The BLUE FLOWER PPM materially misrepresented the nature of BLUE FLOWER's business to MCB.

67.  The submission of the fraudulent PPM to MCB materially

misrepresented that BLUE FLOWER's business purpose was to serve as a private investment fund when in fact BLUE FLOWER's purpose was to serve as an unlicensed money transmitting business.

68.  Moreover, the PPM was materially fraudulent in that it listed LOPUD as an investment manager when in fact LOPUD provided no such services and only served as an unlicensed money transmitting business.

69.  That BLUE FLOWER listed LOPUD as an investment manager furthered the fraud on MCB that BLUE FLOWER was a legitimate investment fund, as legitimate investment funds have investment managers.

70.  The PPM included a detailed description of how BLUE FLOWER operated, which included use of "subscription" and "redemption" language to justify incoming and outgoing wire transfers.

71.  The terms "subscription" and "redemption" are used in connection with private investment funds.

72.  A "subscription" is used to describe the purchase of shares in a private investment fund.

73.  A "redemption" is used to describe the sale of shares in a private investment fund.

74.  BLUE FLOWER's use of these terms in the PPM materially misrepresented BLUE FLOWER's business model as a private investment fund when, in fact, it was an unlicensed money

transmitting business.

75.  Bank representatives understood LOPUD to be involved in the investment industry.

76.  For example, on or about July 23, 2020, bank representatives requested a "funds flow chart" that would show how LOPUD would use its Subject Bank Account.

77.  In response, bank representatives received a funds flow chart that claimed LOPUD's Subject Bank Account would receive funds from BLUE FLOWER, an American bank, and an American clearing house.

78.  The same chart also claimed that LOPUD's outflows would be "commissions fees to financial advisors, funds of funds and return of client liquidations."

79.  This chart materially misrepresented LOPUD as engaging in investment activities, when LOPUD, in fact, functioned as an unlicensed money transmitting business.

80.  DCB and Ivo Rojnica represented in email correspondence with bank representatives that MUDART SPRINGS was a private investment company that would make investments in the United States and handle business logistics.

81.  For example, on or about May 12, 2020, bank representatives inquired about the nature of MUDART SPRINGS' business relationships with wire counterparties.

82.  In response, Ivo Rojnica represented MUDART SPRINGS as being an "Investment Holding Company and logistics consulting

company…"

83.  Rojnica also forwarded invoices to a bank representative that MUDART SPRINGS purportedly sent to other companies, billing those companies for "Logistics Consultancy" services.

84.  There is no evidence that MUDART SPRINGS was involved in logistics and consultancy services.

85.  MUDART SPRINGS acted as an unlicensed money transmitting business.

86.  These misrepresentations made to Bank Representatives at MCB were materially misleading.

87.  MCB would not have established the Subject Bank Accounts for BLUE FLOWER, LOPUD, and MUDART SPRINGS if MCB had known that BLUE FLOWER, LOPUD, and MUDART SPRINGS were operating as unlicensed money transmitting businesses.

88.  MCB would have closed the Subject Bank Accounts for BLUE FLOWER, LOPUD, and MUDART SPRINGS if MCB had known that BLUE FLOWER, LOPUD, and MUDART SPRINGS were operating as unlicensed money transmitting businesses.

## BLUE FLOWER, LOPUD, and MUDART SPRINGS UTILIZED THE SUBJECT BANK ACCOUNTS TO ACT AS AN UNLICENSED MONEY TRANSMITTER

89.  From the time that BLUE FLOWER, MUDART SPRINGS, and LOPUD were opened in or about September 2019, February 2020, and September 2020, respectively, the Subject Bank Accounts operated as conduits for an unlicensed money transmitting business.

90.   Funds received by the Subject Bank Accounts were transferred either to accounts in the United States or to accounts overseas.

91.   Clients were charged fees for the use of BLUE FLOWER, MUDART SPRINGS, and LOPUD's money transmission services.

92.   A review of MCB financial records for the Subject Bank Accounts revealed that they were regularly used to rapidly move funds.

93.   The rapid movement of funds was consistent with BLUE FLOWER's, LOPUD's, and MUDART SPRINGS' actual use of the Subject Bank Accounts as pass-through accounts.

94.   Moreover, the rapid movement of funds was inconsistent with the representations made to Bank Representatives at MCB that BLUE FLOWER, LOPUD, and MUDART SPRINGS were using the Subject Bank Accounts for investment purposes. The amounts described below are approximate.

95.   Between September 12, 2019, and September 30, 2020, $81,554,898.90 was transferred *into* the BLUE FLOWER Subject Bank Account.

96.   Of these funds, $31,901,009.24 were international deposits, and $49,653,889.66 were domestic deposits.

97.   During that same time period, $81,025,411.43 was transferred *out* of the BLUE FLOWER Subject Bank Account.

98.   Of these funds, $1,874,522.00 were international

transfers, and $79,150,889.43 were domestic transfers.

99. Regarding LOPUD's financial activities, between October 8, 2020, and December 11, 2020, $6,150,020.45 was transferred *into* LOPUD's Subject Bank Account.

100. Of these funds, $2,813,790.00 of the wires were domestic, and $3,336,230.45 were international.

101. During the same period, $4,313,804.00 was transferred *out* of LOPUD's Subject Bank Account.

102. All of the outgoing wires discussed in the previous paragraph were domestic transfers.

103. Regarding MUDART SPRINGS' financial activities, between March 2, 2020, and September 30, 2020, $14,710,331.00 was transferred *into* MUDART SPRINGS' Subject Bank Account.

104. $5,466,219.70 were in international deposits, and $9,244,111.30 in domestic deposits.

105. During this same period, $13,904,804.80 was transferred *out* of MUDART SPRING's account

106. Of these funds, $1,380,096.00 in international transfers and $12,524,708.80 in domestic transfers.

107. The transfer of funds *out of* the Subject Bank Accounts is consistent with clients or third parties obtaining U.S. Dollars by withdrawing from the Subject Bank Accounts following a deposit of Argentine pesos with a blue dollar peso exchanger in Argentina as outlined in Paragraph 43 and Figure 1.

108. Likewise, the transfer of funds *into* the Subject Bank Accounts is consistent with clients or third parties moving funds into the Subject Bank Accounts to obtain Argentine pesos from a blue dollar peso exchanger in Argentina, as outlined in Paragraph 45 in Figure 2.

109. At all material times, Ivo Rojnica and Jonathan Rivas knowingly conducted, controlled, managed, supervised, directed, and owned all or part of a money transmitting business through Subject Bank Account BLUE FLOWER.

110. BLUE FLOWER's business affected interstate or foreign commerce in some manner or degree.

111. Ivo Rojnica and Jonathan Rivas failed to comply with the money transmitting business registration requirements for Subject Bank Account BLUE FLOWER, as required by Title 31, United States Code, Section 5330 and the regulations prescribed under that section, including 31 CFR § 1022.380.

112. At all material times Ivo Rojnica and Jonathan Rivas knowingly conducted, controlled, managed, supervised, directed, and owned all or part of a money transmitting business through Subject Bank Account LOPUD.

113. LOPUD's business affected interstate or foreign commerce in some manner or degree.

114. Ivo Rojnica and Jonathan Rivas failed to comply with the money transmitting business registration requirements for Subject

Bank Account LOPUD, as required by Title 31, United States Code, Section 5330 and the regulations prescribed under that section, including 31 CFR § 1022.380.

115. At all material times, Ivo Rojnica and Jonathan Rivas knowingly conducted, controlled, managed, supervised, directed, and owned all or part of a money transmitting business through Subject Bank Account MUDART SPRINGS.

116. MUDART SPRINGS's business affected interstate or foreign commerce in some manner or degree.

117. Ivo Rojnica and Jonathan Rivas failed to comply with the money transmitting business registration requirements for Subject Bank Account MUDART SPRINGS, as required by Title 31, United States Code, Section 5330 and the regulations prescribed under that section, including 31 CFR § 1022.380.

118. The nature of unlicensed money transmission is cyclical meaning that it is an ongoing offense.

119. The Defendant Properties were involved in the unlicensed money transmitting businesses operated by Ivo Rojnica and Jonathan Rivas.

120. Moreover, all assets owned by BLUE FLOWER, LOPUD, MUDART SPRINGS are also "involved in" unlicensed money transmission, including the Defendant Properties.

121. Because the Defendant Properties were "involved in" transactions or attempted transactions from a place in the United

States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, Bank Fraud, the Defendant Properties was "involved in" international money laundering in violation of 18 U.S.C. § 1956(a)(2)(A).

122. Ivo Rojnica and Jonathan Rivas agreed to violate 18 U.S.C. § 1956(a)(2)(A).

123. Ivo Rojnica and Jonathan Rivas knowingly engaged in the conspiracy with the specific intent to violate 18 U.S.C. § 1956(a)(2)(A).

124. Because the Defendant Properties were involved in Ivo Rojnica and Jonathan Rivas' agreement to violate 18 U.S.C. §1956(a)(2)(A), Defendant Properties contained in the Subject Bank Accounts were "involved in" an international money laundering conspiracy in violation of 18 U.S.C. §1956(h) and are subject to forfeiture pursuant to 18 U.S.C. §981(a)(1)(A).

125. There was no other source for the funds.

### CLAIM FOR RELIEF

**WHEREFORE** Plaintiff, the United States, requests as follows:

(1) Judgment against Defendant Properties in favor of the United States;

(2) issue process to enforce forfeiture of Defendant

Properties, by requiring all persons having interest in Defendant Properties be cited to appear and show cause why forfeiture should not be decreed, and that this Court decree forfeiture of Defendant Properties to the United States of America for disposition according to law; and the United States be granted any other relief as this Court deems just and proper, together with the costs and disbursements of this action.

Dated: July 31, 2025

Respectfully submitted,

MARGARET A. MOESER
CHIEF, MONEY LAUNDERING AND ASSET
RECOVERY SECTION

By:  *Yuliana Reyes*

YULIANA REYES
Trial Attorney
MARK A. IRISH
Senior Trial Counsel
Money Laundering and Asset Recovery
Section
United States Department of Justice
1400 New York Avenue, NW
Bond Building, Suite 1012
Washington, DC 20005
Telephone: (202) 514-1263
Email: Yuliana.Reyes@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## **VERIFICATION**

I, Alexander Rayas, a Special Agent with U.S. Department of Justice,
Federal Bureau of Investigation hereby verify and declare under
penalty of perjury that I have read the foregoing Complaint for
Forfeiture and know the contents thereof, and that the factual
statements contained in the Complaint for Forfeiture are true to
my own knowledge, except those factual statements herein stated to
be alleged on information and belief and as to those factual
statements I believe them to be true. In signing this verification,
I am not opining on any legal theories or conclusions contained
herein. The sources of my knowledge and information and the grounds
of my belief are the official files and records of the United
States, information supplied to me by law enforcement officers, as
well as my investigation of this case, together with others, as a
Special Agent of the FBI. This Complaint for Forfeiture does not
set forth each and every fact learned during the course of this
investigation or known to the United States but rather only contains
those factual statements necessary to establish facts to support a
reasonable belief that the United States will be able to meet its
burden of proving at trial that the Defendant Properties are subject
to forfeiture. The dates and amounts referred to in this Complaint
for Forfeiture are approximate. The names referenced may have
alternate spellings in original and translated documents.

I hereby verify and declare under penalty of perjury under the
laws of the United States of America, pursuant to 28 U.S.C.§ 1746,
that the foregoing is true and correct.


Executed on this 31st day of July 2025.

_____

ALEXANDER RAYAS
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION